*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JAMAR LEVON WOODMORE,

Defendant-Appellant.

UNPUBLISHED
August 18, 2022

No. 347252
Wayne Circuit Court
LC No. 18-006013-01-FC

Before: GADOLA, P.J., and CAVANAGH and K. F. KELLY, JJ.

PER CURIAM.

Defendant appeals as of right his jury convictions of first-degree premeditated murder, MCL 750.316(1)(a), carrying a concealed weapon (CCW), MCL 750.227, felon in possession of a firearm, MCL 750.224f, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant was sentenced as a third-offense habitual offender, MCL 769.11, and his sentence included life imprisonment without parole for the murder conviction. On appeal, defendant challenges the circuit court's jurisdiction, the sufficiency of the evidence with respect to the murder conviction, and the effectiveness of his counsel. We affirm.

## I. BACKGROUND FACTS

Defendant's convictions arise from the fatal shooting of Leon Webb ("the victim") in the afternoon of June 28, 2018, following a verbal and physical altercation between defendant and the victim at the barbershop where they both worked.

At trial, a male barbershop patron testified that he was getting a haircut when defendant walked in the barbershop obviously upset, disturbed, and yelling. Defendant worked there but was not working on that day. Other people in the barbershop wanted defendant to leave and the victim asked defendant to step outside. They went outside and started to fistfight. While fighting, the victim dropped a handgun, discarding it like he did not want it involved in the fight. The fight did not last long, maybe about a minute. Then the victim went back inside the barbershop and continued cutting the hair of a young child who was sitting in his barber chair. After the fight, defendant went and sat in his vehicle parked in front of the barbershop. The patron-witness saw that defendant was rocking back and forth in his vehicle in a pretty aggressive manner like he was

-1-

really upset.  After the patron paid for his haircut and was preparing to leave, defendant walked through the front door of the barbershop with a black handgun in his hand.  Defendant approached the victim and pointed his gun at the victim and the child sitting in the barber chair.  There were at least 15 people there—adults and children—and the witness and other people began moving towards the back door of the barbershop.  As the patron-witness looked to see if the child was still in the barber chair, he saw defendant's handgun fire a shot.  The victim—who had tried to crouch down behind his barber chair and whose gun had been in his waistband—then fired his gun also.  While outside, this witness heard several gunshots and called 911.  Within a couple minutes, he went back inside the barbershop and found the victim on the floor, bleeding but alive.  As shown on the surveillance video, the shooting took about one minute, after which defendant walked out of the barbershop, got into his vehicle, and drove off.

Another barbershop patron, a lady who brought her child in for a haircut, saw defendant start an argument with the victim.  There were about 12 people in the barbershop, including adults and children.  Defendant invited the victim to step outside and they went outside and began fistfighting.  She looked out the window and saw that the victim was getting the best of defendant.  She saw no weapons.  The fight was over within a couple of minutes, after which the victim came back inside and began cutting the hair of a little boy who was sitting in his barber chair.  A short time later, defendant was at the front door and she heard people tell him not to "come in here with that."  She believed defendant was coming back in to retaliate.  And she saw defendant with what she believed was a gun in his hand.  She and her son and his barber began moving toward the back door of the shop but that door was locked.  She heard about six shots before another barber came and unlocked the back door, which they ran through.  She stayed outside in the back until she saw defendant leave in his Jeep.  She then went back inside the barbershop and saw the victim laying on the floor bleeding.  She got in her car and left.

A barber who was working at the barbershop on the day of this shooting also testified that he heard defendant and the victim arguing in the shop until defendant suggested that they go outside to fight.  The barber watched the fistfight and it was a fair fight that lasted only 30 seconds to a minute.  The victim hit defendant, defendant fell, and the victim hit him some more; although defendant tried to hit the victim, he did not connect.  During the fight, a gun fell to the ground and he assumed it came from the victim.  The barber saw defendant try to reach for it, but the victim pushed defendant away from it and moved the gun while saying that it was going to be a fair one-on-one fight.  After the fight ended, the victim went back inside, changed his shirt, and started cutting a little boy's hair.  The victim was not upset; it seemed like it was just a big brother-little brother situation.  After the fight, defendant went and sat inside his vehicle for about five minutes.  The barber then saw defendant walk inside the barbershop with a pistol in his hand.  Defendant walked directly up to the victim's barber station and pointed the black handgun directly at the victim and the child sitting in the barber chair.  Defendant said to the victim, "I'll slump your bitch ass," which meant that he would shoot him.  The barber-witness heard people yelling for a key to the backdoor—which he had—so he ran and unlocked the back door and people ran out.  He did not see the shooting begin but he heard a "mass amount of gunshots" and stayed by the back door.  Eventually he looked toward the front of the shop and saw defendant leave out the front door, get in his car, and drive away.  As he was driving away, defendant blew his car horn, then held up a two-finger peace sign.  The barber-witness ran into the barbershop and saw the victim's barber chair turned over on the floor with bullet holes in it.  The victim was laying on the floor bleeding and yelling for help.

The victim was subsequently taken to the hospital by ambulance where he ultimately died from his gunshot wounds. Personnel from the Detroit Police Department arrived at the barbershop and evidence was recovered, including one 9-millimeter semiautomatic Ruger pistol, 23 fired shell casings, and 13 bullets or fragments of bullets. Examination by a firearm and toolmark expert revealed that seven of the shell casings came from the pistol that was recovered, but the remaining 16 shell casings came from an unknown—but the same 9-millimeter—handgun. And of the 13 bullets or fragments that were recovered, at least 10 were eliminated as having been fired from that recovered pistol.

On July 4, 2018, defendant was contacted by the Wayne County Sheriff Department and asked to participate in a live line-up but he declined. Cellular phone detail records were analyzed in this case for a cell phone number associated with defendant as the subscriber. On the date and at the time of this shooting, no calls were placed by this phone to 911. The cellular records for this phone indicate that it was at the scene of this incident and active at 3:18 p.m. The time of the shooting was about 3:45 p.m. and the phone was traveling in a southerly direction by 3:58 p.m.

The chief medical examiner for Wayne County testified that the victim's cause of death was multiple gunshot wounds; 13 in total and four were wounds to the back of the victim, but none appeared to be from close range firing.

The police officer in charge of this case testified that surveillance camera video footage showed that after the fistfight ended, a person entered into the passenger side of a black Jeep Cherokee that was registered to defendant and, about two minutes and 26 to 30 seconds later, that person went into the barbershop.

After the prosecution rested its case, defendant moved for a directed verdict, arguing that the evidence presented did not establish the element of premeditation to support a finding of first-degree premeditated murder. The trial court denied the motion, holding that there was enough evidence presented—including the almost 2½ minutes that defendant sat in his vehicle after the fistfight—for the jury to conclude that defendant had enough time to reflect on his actions and intent to kill before proceeding into the barbershop with a gun and killing the victim.

Thereafter, defendant waived his right to remain silent and testified that he was at work at the barbershop on the day of this incident and got into a verbal argument with the victim. Then the victim asked him to step outside. Defendant followed the victim through the front doorway but before defendant could completely step out the door, the victim swung and hit him. Defendant was caught off balance because he was not expecting that and then the victim pulled him outside. The victim removed his own pistol from his waistband and hit defendant a few times in his face with the gun before he dropped it. Defendant and the victim began "tussling" for no longer than about two minutes. The fight just ended with them pushing off each other. The victim retrieved his pistol and put it back on his waist, then walked back into the barbershop.

Defendant went to his car because his face was bloody and he used napkins in his car to clean off the blood. While sitting in his car he thought that he might need stitches at the hospital, but realized his belongings were in the barbershop and he still had clients waiting to see him. Defendant exited his vehicle to grab his things and leave but while he was throwing the dirty napkins away, he was stopped by the victim who "threatened" his life. According to defendant:

"When I walked in, my weapon was showing, because it was on my hip, inside my holster and [the victim] acknowledged that he'd seen my weapon and he told me, 'You better go, put that bitch back up before you get killed.' " Defendant testified that he did not go back into the barbershop to show his weapon or to use his weapon; he intended to get his stuff and go to the hospital. According to defendant, the victim pulled his pistol from his waist and then defendant pulled his pistol. The victim "racked the slide of his weapon" and pointed it at defendant at which time defendant "froze" but then "it was gun fire." There was "mutual gun fire between me and [the victim]." Defendant was in fear for his life and he "emptied the magazine." After the victim fell down, defendant stopped shooting and left the barbershop. He got in his vehicle and pulled away. He did not call 911. He also got rid of the weapon because he had a prior felony and was not supposed to be carrying a weapon.

Defendant testified that he was driving to Beaumont Hospital in Dearborn when he was in a collision with another driver. The police arrived and he told them he was trying to get to the hospital so they called an ambulance and he was taken to the hospital. Defendant did not tell the police about the shooting because he was "shaken up and confused about the whole situation." It took him about a day to gather his thoughts about the shooting; he had "to sleep on it." He became aware that the police were looking for him and turned himself in on June 30th. Defendant admitted that he was asked to participate in a live line-up but declined because he did not have his attorney present at that time.

On cross-examination, defendant testified that he had his gun on him that whole day of the shooting. He agreed that after the fistfight he sat in his vehicle for over two minutes and did not drive away, call police, or call 911. Defendant admitted that when he walked back into the barbershop with his gun, there were innocent adults and children filling the barbershop. But he wanted to get his hair clippers and work phone. Defendant admitted that, according to the trial testimony, the victim had gunshot wounds throughout his body. And defendant had not a single gunshot wound. Defendant admitted that he did not tell the police who responded to his traffic accident that he had just come from a shooting incident where he had been scared for his life. He also never told the police or anyone his version of what happened with regard to this shooting until that day in trial. After defendant's testimony, the defense rested.

The jury ultimately found defendant guilty of first-degree premeditated murder, carrying a concealed weapon, felon in possession of a firearm, and felony-firearm.

## II. POST-CONVICTION PROCEEDINGS

Defendant filed in the trial court a motion for judgment of acquittal or an evidentiary hearing and a new trial. Defendant argued that the prosecution did not properly file the Information with the circuit court; thus, the circuit court had no jurisdiction. Defendant also argued that the verdict of first-degree premeditated murder was against the great weight of the evidence because he did not act with premeditation but instead acted in lawful self-defense. Further, defendant argued that he was denied the effective assistance of counsel and requested that he be granted an evidentiary hearing under *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

The prosecution responded to defendant's motion, arguing that a proper Information was filed in the circuit court, albeit with an incorrect date, and defendant was arraigned on that

-4-

Information without objection; thus, the circuit court had jurisdiction and any error was harmless. Further, the jury verdict was not against the great weight of the evidence; in fact, the evidence overwhelmingly supported his convictions. And defendant was not denied the effective assistance of counsel. Accordingly, defendant's arguments must fail and he is not entitled to any relief.

Following oral arguments on defendant's motion, the trial court held that it had subject-matter jurisdiction, and the jury verdict was not against the great weight of the evidence. However, the court scheduled a *Ginther* hearing regarding defendant's ineffective assistance of counsel claim. Defendant testified at the hearing that he had asked his trial counsel, Larry Polk, to obtain his cell phone records which would show that he called the police on June 28, 2018, at 3:53 p.m. He also asked his attorney to submit into evidence photographs of his facial injuries sustained when the victim "pistol-whipped" him during the fistfight before the shooting. And defendant testified that he wanted one potential juror excluded from the jury because she was a family member of the victim. However, his attorney failed in these regards. Further, his attorney failed to object to questioning about his refusal to participate in a live lineup and failed to request a jury instruction on voluntary manslaughter despite defendant's request.

Defendant's trial counsel testified at the *Ginther* hearing that he saw the photographs of defendant's facial injuries but did not seek their admission into evidence because he believed they undermined the self-defense theory. In other words, there was a fight outside before the shooting which tended to give a basis for defendant's alleged action, i.e., defendant was badly beaten so he later retaliated by shooting the victim. Further, Polk recalled the issue of defendant's phone records for a second phone but did not attempt to get them because defendant told him that, although he attempted to call 911, he never actually talked to the 911 operator so no information was reported about this incident. Polk did not recall any potential jury member stating that the victim was "like a family member" but if it was said, that member of the jury pool would not have been selected for the jury. Polk also testified that he would not have objected to questioning regarding defendant's refusal to participate in a live lineup because defendant did nothing wrong in doing so. Similarly, Polk would not object to questioning about defendant not going to the police with his version of the shooting incident because defendant had the right to remain silent. Polk did not remember whether he considered requesting a jury instruction on manslaughter but he recalled that defendant's position was always that the shooting occurred in self-defense.

Thereafter, the trial court rendered its decision on defendant's claim of ineffective assistance of counsel. First, the court concluded that Polk's decision not to seek admission of the photographs of defendant's alleged injuries sustained in the fight that occurred before the shooting was a reasonable strategic decision; they would not have furthered the self-defense theory as pertains to the shooting that occurred later. In fact, Polk reasonably concluded that they could have actually provided a motive for defendant to commit murder. Second, Polk's decision not to pursue admission of defendant's phone records was reasonable because part of defendant's explanation for going back into the barbershop after the fistfight was to retrieve his phone and, since he had two phones, such an explanation would be undermined and might actually enhance a motive of vengeance on his part. Further, the termination of the 911 call before defendant actually spoke to the operator could be construed by the jury as a consciousness of guilt.

Third, the trial court held that, with regard to the prospective juror's statements, the court took proper action during the jury selection which included excusing her and extensive questioning

of two prospective jurors who were sitting next to her. Polk did move to have one of them excused but the court denied that motion; thus, defense counsel was not constitutionally ineffective. Further, there was nothing which occurred during the jury selection process that affected defendant's right to a fair trial and his counsel's performance during jury selection was not constitutionally ineffective. Fourth, defendant claimed that Polk improperly allowed the prosecution to bring out the fact that defendant refused to appear in a live line-up but the Fifth Amendment is not implicated by appearance in a line-up and evidence of his refusal to participate did not violate his right against self-incrimination. Thus, any objection would have been futile and counsel is not ineffective for failing to make a futile objection. And defendant's claim that his attorney should have objected when the prosecutor questioned him about his prearrest silence—especially when he did not tell police officers who responded to his traffic accident later that day that he had been involved in a shooting—was without merit because such questioning was permissible.

Finally, the court held, defendant's claim that Polk should have requested a voluntary manslaughter jury instruction was without merit because such instruction is only appropriate when a defendant killed in the heat of passion which did not happen in this case. Polk's strategy to focus on a self-defense theory under the circumstances of this case—and as defendant had requested—was reasonable. The trial court concluded that defense counsel was not ineffective in his representation of defendant, and therefore, denied defendant's motion in that regard. Subsequently, the trial court entered an order denying defendant's motion for judgment of acquittal or a new trial.

Defendant appeals as of right.

## III.  ISSUES ON APPEAL

### A.  SUBJECT-MATTER JURISDICTION

Defendant first argues that the circuit court was divested of subject-matter jurisdiction when the prosecution failed to file a timely Information; therefore, defendant's convictions must be vacated. After de novo review, we disagree. See *Hillsdale Co Senior Servs, Inc v Hillsdale Co*, 494 Mich 46, 51; 832 NW2d 728 (2013).

A challenge to a court's subject-matter jurisdiction is a challenge to its authority to hear and determine the particular character or class of the pending case regardless of its particular facts. *People v Washington*, 508 Mich 107, 121-122; 972 NW2d 767 (2021), citing *People v Lown*, 488 Mich 242, 268; 794 NW2d 9 (2011). Defendant does not dispute that, generally, circuit courts have subject-matter jurisdiction over felony cases following bindover from the district court. See *id.*; MCR 6.008(B). Thus, once defendant was bound over by the district court, the trial court had subject-matter jurisdiction over defendant's felony case. Defendant argues, however, that the circuit court was divested of subject-matter jurisdiction when the prosecution failed to file a proper Information in the circuit court. Defendant cites no legal authority to support his claim that a circuit court is divested of subject-matter jurisdiction if the prosecution fails to file a proper Information. Again, "subject-matter jurisdiction" refers to the court's general power and authority to hear a class of cases—here, a felony case. And it is unquestionable that a circuit court has jurisdiction over felony cases. See *Lown*, 488 Mich at 268.

As set forth in MCR 6.112(C): "The prosecutor must file the information or indictment on or before the date set for the arraignment." It is unclear from the record in this case whether the prosecutor properly filed the Information in the circuit court. The register of actions does not specifically indicate that an Information was filed in the circuit court. In any case, defendant and his counsel did appear for an Arraignment on the Information. Defendant waived a formal reading of the Information and stood mute on the charges. No objection to the Information—or regarding the failure to receive a copy of the Information—was raised at that time. There is no indication that defendant or his attorney had not received a copy of the Information. If defendant had raised this issue at his arraignment, the trial court could have clarified the record including by determining whether the Information was properly filed or required amendment because of an incorrect date. And in responding to defendant's argument in this regard in the trial court, the prosecution argued that the Information was indeed filed in the circuit court but because of a ministerial error, it was incorrectly dated July 2, 2018. In denying defendant relief on this claim, the trial court agreed that the Information was properly filed, albeit with the wrong date. Defendant has failed to establish that the trial court was mistaken in this regard.

Nevertheless, even if the Information was not properly filed in the circuit court or if it was incorrectly dated, defendant would not be entitled to have his convictions and sentences vacated as he seeks on appeal. "The purpose of an arraignment is to provide formal notice of the charge against the accused." *People v Waclawski*, 286 Mich App 634, 704; 780 NW2d 321 (2009). And MCR 6.112(G) provides for harmless-error review with regard to errors pertaining to the Information, stating:

> Absent a timely objection and a showing of prejudice, a court may not dismiss an information or reverse a conviction because of an untimely filing or because of an incorrectly cited statute or a variance between the information and proof regarding time, place, the manner in which the offense was committed, or other factual detail relating to the alleged offense.

In this case, there was no "timely objection." See *id*. And defendant has not made a showing of prejudice. "The dispositive question in determining whether a defendant was prejudiced by a defect in the information is whether the defendant knew the acts for which he or she was being tried so that he or she could adequately put forth a defense." *Waclawski*, 286 Mich App at 706. The burden is on defendant to establish that the error was not harmless. *Id*. at 707. Although defendant has extensively quoted the provisions of MCR 6.112 in his brief, he has failed to make any attempt at establishing "a showing of prejudice" as required under MCR 6.112(G). Defendant merely argues that the prosecution's failure to timely file the Information after his preliminary examination mandates that his convictions and sentences be vacated. This argument must fail.

A similar issue arose in *Waclawski*, 286 Mich App at 705, in that "an original felony information was not filed by the prosecutor in [that] case." But, after applying the harmless-error analysis set forth in MCR 6.112(G), this Court concluded that the defendant had not established any prejudice, and thus, dismissal was not warranted. *Id*. at 707. Likewise, in this case, defendant has not established that he was unaware of the charges against him or that he was unable to defend against the charges. Simply stated, he has made no argument of prejudice. Accordingly, defendant's claim on appeal is without merit. Moreover, MCR 6.112(H) provides that, even after a trial, the trial court may permit the prosecutor to amend the Information unless such amendment

-7-

would unfairly surprise or prejudice the defendant. Because the prosecution admitted that the Information contains an incorrect date, its amendment may be sought.

In summary, the trial court was not divested of subject-matter jurisdiction and defendant's argument that his convictions and sentences should be vacated is without merit.

## B. GREAT WEIGHT OF THE EVIDENCE

Next, defendant argues that his conviction on the charge of first-degree premeditated murder was against the great weight of the evidence because he did not act with premeditation and deliberation but merely reacted, in a split-second decision, and in self-defense, to the victim's threatening actions; therefore, he was entitled to a judgment of acquittal. We disagree.

## 1. STANDARD OF REVIEW

Defendant filed a motion for judgment of acquittal or new trial but acquittal is a proper remedy only when the defendant's conviction was not supported by sufficient evidence. See *People v Nix*, 453 Mich 619, 626-627; 556 NW2d 866 (1996); *People v Mitchell*, 301 Mich App 282, 294; 835 NW2d 615 (2013). Defendant raises a "great weight" argument here, not a sufficiency of the evidence argument. A claim that the verdict is against the great weight of the evidence does not implicate issues of constitutional magnitude. *People v Roper*, 286 Mich App 77, 83-84; 777 NW2d 483 (2009). Therefore, whether to grant a new trial is within the discretion of the trial court, *id.*, but should only be granted when the evidence preponderates heavily against the verdict and a serious miscarriage of justice would otherwise result. *People v Lemmon*, 456 Mich 625, 642; 576 NW2d 129 (1998) (citation omitted). Unless there are exceptional circumstances, a reviewing court may not substitute its view of the credibility of witnesses for that of the jury. *Id.* Such an exception includes when the testimony contradicts indisputable physical facts or laws, is patently incredible, defies physical realities, is so implausible that it could not be believed by a reasonable juror, or was so far impeached that it was deprived of all probative value. *Id.* at 643-646 (citations omitted).

This Court reviews the trial court's decision on a motion for a new trial for an abuse of discretion, which occurs when the trial court selects an outcome that is outside the range of principled outcomes. *People v Rao*, 491 Mich 271, 279; 815 NW2d 105 (2012); *People v Kosik*, 303 Mich App 146, 154; 841 NW2d 906 (2013). "A mere difference in judicial opinion does not establish an abuse of discretion." *People v Johnson*, 502 Mich 541, 564; 918 NW2d 676 (2018). "This Court will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses." *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008).

## 2. ANALYSIS

The circuit court did not abuse its discretion when it denied defendant's motion for a new trial based on the claim that the jury verdict on the charge of first-degree premeditated murder was against the great weight of the evidence; therefore, defendant's argument is without merit.

The elements of first-degree premeditated murder are: (1) an intentional killing of a human being (2) with premeditation and deliberation. *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010). Premeditation means "to think about beforehand," and deliberation means "to

measure and evaluate the major facets of a choice or problem." *People v Plummer*, 229 Mich App 293, 300; 581 NW2d 753 (1998) (citation omitted). Premeditation and deliberation require sufficient time to allow the defendant to reconsider his actions, or in other words, sufficient time to "take a second look." *People v Abraham*, 234 Mich App 640, 656; 599 NW2d 736 (1999) (citation omitted); see also *People v Brown*, 137 Mich App 396, 407; 358 NW2d 592 (1984). Factors relevant to the establishment of premeditation and deliberation include: "(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide." *Abraham*, 234 Mich App at 656 (quotation marks and citation omitted). "Circumstantial evidence and reasonable inferences drawn therefrom may be sufficient to prove the elements of a crime." *People v Jolly*, 442 Mich 458, 466; 502 NW2d 177 (1993). Intent and premeditation may be inferred from all of the facts and circumstances and, because of the difficulty of proving a person's state of mind, minimal circumstantial evidence is sufficient. *People v Cameron*, 291 Mich App 599, 615; 806 NW2d 371 (2011); *Kanaan*, 278 Mich App at 622. An intent to kill may be inferred from the use of a dangerous weapon. *People v DeLisle*, 202 Mich App 658, 672; 509 NW2d 885 (1993).

Defendant argues that he did not act with premeditation and deliberation; instead, he acted after a split-second decision and in lawful self-defense. But defendant focuses only on his own trial testimony rather than on all of the evidence presented to the jury.

The eyewitness testimony was consistent that defendant and the victim had a verbal argument in the barbershop that was filled with adults and children. According to two eyewitness barbershop patrons, defendant started the heated verbal argument. Defendant and the victim eventually went outside where they engaged in a physical fistfight. While defendant testified that the victim "pistol-whipped" him, eyewitnesses to the fistfight consistently testified that it was a "fair fight" and that no weapons were involved, although the victim's gun had fallen to the ground during the fight and was moved out of the way. The physical fight lasted about a minute or less and it looked like the victim got the best of defendant. The victim then went back into the barbershop and resumed cutting the hair of a young child who was still sitting in his barber chair. The victim did not seem upset; he simply went back to work.

The eyewitnesses also consistently testified that after the physical fight ended, defendant went and sat in his vehicle that was parked in front of the barbershop. One eyewitness testified that he saw defendant rocking back and forth in his vehicle in an aggressive manner like he was really upset. According to surveillance video, defendant was in his vehicle for about 2½ minutes when he exited the vehicle and walked back into the barbershop. According to eyewitnesses, defendant walked through the front door of the barbershop with a black handgun in his hand. Defendant was not seen with a gun on his person at any time before this. One eyewitness testified that she believed defendant came back inside to retaliate. People who were in the barbershop were telling defendant not to "come in here with that," meaning with the gun. But defendant continued walking directly toward the victim with his black handgun pointed at the victim and the child who was sitting in the barber chair. One eyewitness heard defendant say to the victim, "I'll slump your bitch ass," which meant that he would shoot him. Then defendant started firing his gun, shooting at the victim. The victim, who had a gun in his waistband, returned the gunfire but missed every shot. After the shooting stopped, the witnesses found the victim on the floor, bleeding profusely but still alive. As the medical examiner later determined, he had been shot 13 times—with four of those wounds to the back—which killed him. After the shooting, as shown on surveillance video,

defendant walked out of the barbershop, got in his vehicle, and drove off. One eyewitness testified that, as he was driving away, defendant blew his car horn and held up a two-finger peace sign. Defendant was not at the barbershop when police and emergency medical personnel arrived on the scene. But 23 fired shell casings were recovered from the scene by police, seven of which came from the victim's 9-millimeter Ruger pistol that was recovered at the scene and 16 of which came from an unknown handgun. Defendant testified that he disposed of his gun after the shooting.

On appeal, defendant bases his argument on the fact that his own trial testimony portrayed a vastly different scenario leading to the gunfight that left the victim dead. Defendant acknowledged getting into a verbal argument with the victim which led to a physical fight outside—where the victim hit him in the face a few times with his pistol. Defendant testified that while he was sitting in his vehicle after the fight, he noticed that he was bleeding and thought he might need stitches at the hospital. But first he wanted to get his work-cell phone and hair clippers from inside the barbershop. So, while his pistol was holstered on his hip—where it had been all day—he reentered the barbershop. It was then that the victim saw defendant's gun and told him that he better put the gun away or leave before he got himself killed. At which point, according to defendant, the victim pulled his own pistol from his waist, "racked the slide," and pointed it at defendant. Defendant testified that he "froze" but then "it was gun fire." Because defendant was in fear for his life, he "emptied the magazine." After the victim fell to the floor, defendant left the barbershop. Defendant admitted that he drove away in his vehicle and got rid of his gun. He did not call 911 and speak to a 911 operator. And when he was later in a traffic accident in Dearborn, he did not tell the responding police officers that he had been in a shoot-out where he had been scared for his life.

Defendant argues on appeal that he could not be guilty of first-degree premeditated murder because the relevant fact was that—upon his return to the barbershop to retrieve his personal items following the fistfight—he was met with a gun pointed at him and he reacted in a split-second, not after 2½ minutes. Defendant's argument, however, is merely that the jury should have believed his testimony and not the testimony of the eyewitnesses. In other words, the jury should not have believed that the victim was in the middle of cutting a child's hair when defendant walked back into the barbershop with his gun in his hand, walked directly up to the victim, threatened to "slump" his "bitch ass," and then started shooting at the victim. But defendant's argument must fail. Again, in determining whether a verdict is against the great weight of the evidence, the question is whether the evidence preponderates heavily against the verdict such that it would be a miscarriage of justice to allow the verdict to stand. *Lemmon*, 456 Mich at 642. A reviewing court may not substitute its view of the credibility of the witnesses for that of the jury unless there are exceptional circumstances and no such circumstances exist in this case. See *id*. at 643-646. The contrary witness testimony did not contradict indisputable physical facts or laws, was not patently incredible or implausible, did not defy physical realities, and was not so far impeached that it was deprived of all probative value. See *id*. Accordingly, the jury's guilty verdict on the charge of first-degree premeditated murder was not against the great weight of the evidence and the trial court did not abuse its discretion in denying defendant's motion in this regard. See *Rao*, 491 Mich at 279.

## C. INEFFECTIVE ASSISTANCE OF COUNSEL

Next, defendant argues that he was denied the effective assistance of counsel. We disagree.

### 1. STANDARD OF REVIEW

A claim of ineffective assistance of counsel generally presents a mixed question of fact and constitutional law and, because a *Ginther* hearing was conducted, the trial court's findings of fact are reviewed for clear error and questions of law are reviewed de novo. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012); *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). Regard should be given to the trial court's opportunity to assess the credibility of the witnesses who appeared at the hearing. MCR 2.613(C).

Defense counsel is presumed to provide effective assistance, and a defendant bears a heavy burden to overcome that presumption. *People v Solloway*, 316 Mich App 174, 188; 891 NW2d 255 (2016). To prevail on a claim of ineffective assistance, a defendant must satisfy two prongs: "(1) counsel's performance was deficient, meaning that it fell below an objective standard of reasonableness, and (2) but for counsel's error, there is a reasonable probability that the outcome of the defendant's trial would have been different." *Id.* Counsel's performance should be evaluated at the time of the alleged error without the benefit of hindsight, *People v Grant*, 470 Mich 477, 487; 684 NW2d 686 (2004), and the defendant must overcome a strong presumption that counsel's actions were based on reasonable trial strategy, *People v Cline*, 276 Mich App 634, 637; 741 NW2d 563 (2007). Counsel will not be considered ineffective where an objection would have been futile. *People v Thomas*, 260 Mich App 450, 457; 678 NW2d 631 (2004).

### 2. ANALYSIS

The trial court properly denied defendant a new trial on the ground that he was deprived of the effective assistance of counsel because none of the issues raised have merit.

First, the trial court rejected defendant's claim that his attorney should have moved to dismiss the case on jurisdictional grounds because the prosecutor failed to timely file the Information. The court concluded that the Information was properly filed, albeit with the wrong date, and defendant was arraigned on that Information. Defendant has not established any error in the court's findings. Moreover, as discussed above, any error in this regard was harmless, i.e., not outcome determinative. See *Solloway*, 316 Mich App at 188.

Second, the trial court rejected defendant's claim that his attorney should have objected to the prospective jury pool as tainted. Defendant had claimed that a prospective female jury member had indicated out loud that she was related to the victim in this case and could not sit on this jury. The trial court excused all of the prospective jury members except for her and she confirmed that the victim was "something like a family member to me." She indicated that she told a man sitting to her right that this was a serious case to her and that the victim was a family member. She was excused from the case by the trial court and the man she had spoken to was brought into the courtroom, outside the presence of the other members. When asked what the female sitting next to him had said to him, this man replied: "She just said she couldn't serve on" the jury. He was asked if she told him why she could not serve and he replied in the negative. He said he "was trying not to really listen to her" and did not know her or any other information about the incident. A third prospective jury member who had been sitting on the other side of the female was then brought into the courtroom and he told the court that all the woman said was that she "can't do this." He also said, "She didn't say nothing to me. She just said it out loud." He did not know

why she said that. After this questioning was completed, defense counsel stated to the court that he would ask that the first man be excused from the prospective jury pool on the ground "that the juror has the potential to be tainted." The trial court denied the request, holding: "From the inquiries made by the Court and follow-up questions, I do not feel that this juror, . . . was tainted, so I'm going to leave him on." Therefore, as the trial court concluded, defendant's claim that his attorney was ineffective with regard to this matter is without factual support and is without merit.

The second prospective jury member who defendant claims tainted the jury pool was a Wayne County Sheriff Deputy who—referring to defendant—stated: "I do know him from work, from where I work." This prospective jury member was asked if he could be a fair and impartial juror despite that and he replied in the affirmative. At no time did this prospective jury member indicate *how* he knew defendant "from work." In other words, he could have worked *with* defendant in the sheriff department. He never indicated that he knew defendant was involved in any criminal matters—or had run-ins with the law as defendant suggests—prior to his involvement in this case. While the trial court did not directly address this matter with respect to defendant's ineffective assistance of counsel claim, the court did specifically hold that nothing that occurred during the jury selection process affected defendant's right to a fair trial and his counsel was not constitutionally ineffective. We agree with the trial court's conclusion. Defendant has failed to demonstrate that his counsel's performance during the jury selection process fell below an objective standard of reasonableness.

Third, the trial court rejected defendant's claim that his attorney was ineffective for failing to object to the prosecution's questioning of defendant about the facts that he refused to participate in a live lineup and failed to apprise the police that he had been involved in the shooting incident until his appearance at trial. The trial court concluded that the Fifth Amendment is not implicated by appearance in a lineup and questioning about prearrest silence is permissible; therefore, defense counsel was not ineffective for failing to raise futile objections. We agree.

On appeal defendant claims that the "prosecution first elicited, without objection, that [defendant] declined to participate in a live lineup, when such information was irrelevant to the proceedings and when this evidence violated [defendant's] right to remain silent." Defendant is referring to the prosecution's questioning of a member of the Wayne County Sherriff's Department who testified that she came into contact with defendant on July 4, 2018, when she asked defendant if he was interested in doing a live line-up and he declined. An objection that such questioning violated defendant's right to remain silent would have been futile. As the prosecution argued, this Court in *People v Benson*, 180 Mich App 433, 437; 447 NW2d 755 (1989), rev'd in part on other grounds, 434 Mich 903 (1990), stated: "The Fifth Amendment is not implicated by appearance in a lineup; thus, evidence of the refusal to appear in the lineup did not violate defendant's right against self-incrimination." See, also, *United States v Wade*, 388 US 218, 222-223; 87 S Ct 1926; 18 L Ed 2d 1149 (1967). Therefore, the questioning regarding the fact that defendant declined to participate in a live lineup did not implicate defendant's right to remain silent and his attorney was not ineffective for failing to make a futile objection. See *Thomas*, 260 Mich App at 457.

Similarly, defendant's claim that his attorney was ineffective for failing to object to the prosecution's questioning of him about the fact that the trial was the first time he explained his version of the events is without merit. In particular, defendant claims that the questioning violated his Fifth Amendment rights and challenges this cross-examination questioning of him:

*Q.* Is it fair to stay that until today, you have never mentioned this story to a single police officer?  Correct?

*A.* That's correct.

*Q.* It has been  - - in fact, our officer just counted 139 days since June 28th of 2018.  Haven't thought to mention this to anyone, right?

*A.* That's correct.

* * *

*Q.* And again, Mr. Woodmore, you have never told anyone about what you are claiming happened until today, right?

*A.* That is correct.

But defendant takes the questioning out of context.  This questioning clearly pertained to the fact that, after the shooting and when defendant was ostensibly on his way to a hospital in Dearborn, he was in a traffic accident.  Dearborn police officers responded to that traffic accident scene and defendant never told these officers that—within the last hour—he had been scared for his life and had to shoot a man 13 times in self-defense.  In fact, he told the responding officers nothing about the shooting.  The questioning that follows occurred just before the testimony referenced and challenged by defendant:

*Q.* Okay.  Now, in fact, when you get into this traffic accident, you encounter police, correct?

*A.* That's correct.

*Q.* Don't tell them that you just shot someone 13 times, do you?

*A.* No.

*Q.* Don't tell someone that you were fighting for your life and you, in your words just moments earlier, did you?

*A.* No.

*Q.* Okay.  Didn't tell them that you were scared for your life and that they should go check out what might have just happened?  Don't tell them that, right?

*A.* Not at all.

*Q.* In fact, you don't tell them nothing (sic) about that, do you?

*A.* No.

That the prosecution was referring to the fact that defendant did not disclose the shooting to responding Dearborn police officers, is clear from defense counsel's follow-up question during redirect examination:

> *Q*. She talks about – the prosecutor talks about you didn't say anything to the police when you encountered the Dearborn Police?
>
> *A*. That's correct.
>
> *Q*. Why not?
>
> *A*. At the time, it [sic] so much going on, I'm still shaken up from the situation. I was scared to say something.

Accordingly, the prosecution's questioning of defendant referred to his prearrest silence—not his silence after he was in police custody and received *Miranda*[1] warnings. It is well settled that "[t]he use of a defendant's silence during contact with police that does not occur at the time of arrest in the face of accusation for impeachment purposes does not violate the Fifth Amendment or the Michigan Constitution." *People v Cetlinski*, 435 Mich 742, 760; 460 NW2d 534 (1990) (internal quotation marks and citation omitted). Therefore, this argument is without merit and his attorney was not ineffective for failing to raise such an objection.

Fourth, the trial court rejected defendant's claim that his counsel was ineffective for failing to admit into evidence (1) photographs of defendant's facial injuries sustained when he was allegedly pistol-whipped and (2) defendant's cell phone records which purportedly showed that he made a call to the police after he fled the shooting scene. The court concluded that not seeking the admission of the photographs of defendant's alleged injuries was a reasonable strategic decision; the shooting occurred minutes after that fistfight and the injuries could have demonstrated a motive for the murder. Further, the decision not to seek the cell phone records was reasonable because they would have proven that defendant had a second phone and actually had no reason to return to the barbershop to retrieve his phone after the fistfight—as he had claimed. And the fact that defendant terminated the 911 call before he spoke to the operator could be construed by the jury as a consciousness of guilt. We agree with this reasoning.

At the *Ginther* hearing, defense counsel Polk testified that he saw the photographs depicting defendant's claimed injuries and did not seek their admission into evidence because he believed they undermined defendant's self-defense theory, i.e., gave rise to a motive for the killing. Courts afford defense counsel "wide discretion in matters of trial strategy because counsel may be required to take calculated risks to win a case. *Heft*, 299 Mich App at 83. Decisions as to what evidence to present are presumed to be matters of trial strategy and this Court will not substitute its judgment for that of counsel in such matters, nor will it assess counsel's performance with the benefit of hindsight. *People v Rockey*, 237 Mich App 74, 76-77; 601 NW2d 887 (1999). Defense

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

counsel Polk's reasoning was sound and did not fall below an objective standard of reasonableness. See *Solloway*, 316 Mich App at 188.

At the *Ginther* hearing, defense counsel Polk also explained that he did not attempt to get the phone records for defendant's second cell phone because defendant never actually reported the shooting incident even if he had called 911. Defense counsel's reasoning was sound and did not fall below an objective standard of reasonableness. See *id*. Defendant had claimed that after the fistfight and after sitting in his vehicle, he determined that he had to go back inside the barbershop to retrieve his cell phone and hair clippers. That was the reason he did not immediately leave the barbershop to go to the hospital for stitches he claimed were required after the fistfight. If the jury was apprised that defendant had another cell phone, it might undermine this testimony. And the fact remained that defendant did not report the shooting incident even if he did call 911, which could be construed as evidence of defendant's consciousness of guilt. Defense counsel Polk's decision not to seek the admission of defendant's cell phone records was a reasonable trial strategy under the circumstances.

Fifth, the trial court rejected defendant's claim that his attorney was ineffective for failing to request a voluntary manslaughter jury instruction. The court concluded that such instruction is only appropriate when a defendant killed in the heat of passion and, in this case, there was no evidence that defendant killed in the heat of passion. Thus, Polk's strategy to focus on a self-defense theory under the circumstances of this case was reasonable. The trial court did not err.

The elements of voluntary manslaughter are that the defendant killed in the heat of passion, which was caused by adequate provocation, and there was no lapse of time during which a reasonable person could have controlled his passions. *People v Pouncey*, 437 Mich 382, 388; 471 NW2d 346 (1991). At the *Ginther* hearing, defense counsel Polk testified that he could not remember whether he considered requesting a voluntary manslaughter jury instruction but he did recall that defendant's position was always that the shooting occurred in self-defense. In other words, it appears Polk's trial strategy likely was to pursue only a self-defense theory—and not a claim that defendant killed in the heat of passion. "Failing to request a particular jury instruction can be a matter of trial strategy." *People v Dunigan*, 299 Mich App 579, 584; 831 NW2d 243 (2013).

But a jury instruction of voluntary manslaughter was not supported by the evidence. See *People v Canales*, 243 Mich App 571, 574; 624 NW2d 439 (2000) ("Jury instructions must include all the elements of the charged offense and must not exclude material issues, defenses, and theories if the evidence supports them."). The evidence showed that almost 2½ minutes elapsed between the fistfight outside the barbershop and defendant's return to the inside of the barbershop. During that 2½ minutes, defendant sat in his vehicle and was free to leave the barbershop. But defendant did not leave. Instead, defendant walked back inside the barbershop with—as he admitted—his gun showing. According to defendant's testimony, the victim told him that he "better go, put that bitch back up before you get killed." But defendant did not leave the barbershop or remove and put his gun away. Then, according to defendant, the victim pulled his gun and pointed it at defendant. Defendant did not leave the barbershop. When the victim allegedly "racked the slide of his weapon," defendant still did not leave the barbershop. Instead, defendant pulled his gun and started shooting. The victim was struck numerous times and defendant was not struck by a single bullet. Thus, considering defendant's testimony, a jury instruction on voluntary manslaughter was

not warranted and a request for it would not have been granted. Defendant had the opportunity to leave the barbershop—even before the victim allegedly pulled his gun. After seeing that defendant returned to the barbershop with a gun, the victim asked him to put the gun away or leave but defendant did neither. Defendant could have left the barbershop instead of pulling his gun and firing it several times at the victim. Defendant did not kill the victim in the heat of passion which was caused by adequate provocation without a lapse of time during which a reasonable person could have controlled his passions. Thus, as the trial court concluded, defense counsel was not ineffective for failing to request a voluntary manslaughter jury instruction.

In summary, defendant's arguments in support of his claim of ineffective assistance of counsel are without merit and he is not entitled to appellate relief.

## D. SUFFICIENCY OF THE EVIDENCE

Finally, in his brief filed under Administrative Order 2004-6, Standard 4, defendant argues that his conviction for first-degree premeditated murder was not supported by sufficient evidence, and thus, his motion for directed verdict should have been granted. We disagree.

## 1. STANDARD OF REVIEW

No special steps are required for a criminal defendant to preserve a challenge to the sufficiency of the evidence. *People v Cain*, 238 Mich App 95, 116-117; 605 NW2d 28 (1999); see also *People v Patterson*, 428 Mich 502, 514-515; 410 NW2d 733 (1987). A challenge to the sufficiency of the evidence is reviewed de novo. *People v Bailey*, 310 Mich App 703, 713; 873 NW2d 855 (2015). When considering whether sufficient evidence was presented at trial to support a conviction, we view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012) (quotation marks and citation omitted). Direct evidence of guilt is not required. *People v Williams*, 294 Mich App 461, 471; 811 NW2d 88 (2011). "Rather, circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *Id*. (quotation marks, brackets, and citation omitted). "This Court will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses." *Kanaan*, 278 Mich App at 619. "All conflicts in the evidence must be resolved in favor of the prosecution." *Id*.

## 2. ANALYSIS

The guilty verdict on the charge of first-degree premeditated murder was supported by sufficient evidence; therefore, defendant's argument is without merit.

As discussed above, the elements of first-degree premeditated murder are: (1) an intentional killing of a human being (2) with premeditation and deliberation. *Bennett*, 290 Mich App at 472. Premeditation means "to think about beforehand," and deliberation means "to measure and evaluate the major facets of a choice or problem." *Plummer*, 229 Mich App at 300 (citation omitted). Premeditation and deliberation require sufficient time to allow the defendant to reconsider his actions, or in other words, sufficient time to "take a second look." *Abraham*, 234 Mich App at 656 (citation omitted); see also *Brown*, 137 Mich App at 407. Factors relevant to the establishment of premeditation and deliberation include: "(1) the prior relationship of the parties;

(2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide." *Abraham*, 234 Mich App at 656 (quotation marks and citation omitted). "Circumstantial evidence and reasonable inferences drawn therefrom may be sufficient to prove the elements of a crime." *Jolly*, 442 Mich at 466. Intent and premeditation may be inferred from all of the facts and circumstances and, because of the difficulty of proving a person's state of mind, minimal circumstantial evidence is sufficient. *Cameron*, 291 Mich App at 615; *Kanaan*, 278 Mich App at 622.

Defendant claims that there was insufficient evidence of premeditation and deliberation to support the jury verdict. But the evidence—as thoroughly discussed above with regard to defendant's claim that this conviction was against the great weight of the evidence—was sufficient for the jury to conclude that defendant had time to think about his actions while sitting in his vehicle, i.e., premeditate, and to consider and evaluate his choices, i.e., deliberate. He did not go back inside the barbershop for almost 2½ minutes after the fistfight ended—sufficient time to "take a second look." No one testified to seeing defendant with a gun at any time before he went back inside the barbershop with a gun in his hand. After the shooting ended, defendant fled the scene of the shooting and threw his gun away which could be seen as indicative of his consciousness of guilt. See *People v Dixon-Bey*, 321 Mich App 490, 510; 909 NW2d 458 (2017) (efforts to hide evidence may indicate consciousness of guilt); *People v Coleman*, 210 Mich App 1, 4; 532 NW2d 885 (1995) (fleeing may indicate consciousness of guilt).

In his Standard 4 brief defendant focuses on his own trial testimony to support his claim that there was insufficient evidence of premeditation and deliberation. That is, defendant argues that he reacted instantaneously and in self-defense in response to the victim's actions. To the extent that defendant is arguing that the trial court erred in denying his motion for directed verdict based on that testimony, defendant's claim must fail. Defendant testified *after* his motion for directed verdict was denied by the trial court following the close of the prosecution's proofs. Thus, the trial court did not have that evidence before it when deciding defendant's motion.

And while defendant's trial testimony significantly differed from the eyewitness testimony with respect to the events that transpired before defendant started shooting, credibility determinations are within the exclusive province of the jury and will not be second-guessed by this Court. See *Kanaan*, 278 Mich App at 619. Considering all of the record evidence, viewed in the light most favorable to the prosecution, there was sufficient evidence to enable a rational trier of fact to find beyond a reasonable doubt that defendant shot the victim with the requisite premeditation and deliberation to support his first-degree murder conviction. Accordingly, the jury's guilty verdict on the charge of first-degree premeditated murder was supported by sufficient evidence.

Affirmed.

/s/ Michael F. Gadola
/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly

-17-